USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 20, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

CHONG SHING WU,                          :
                                         :        13 Civ. 8358 (KBF)
                    Petitioner.          :        07 Cr. 961-3 (KBF)
                                         :
         -v-                             :
                                         :        OPINION & ORDER
UNITED STATES OF AMERICA,                :
                                         :
                    Respondent.          :
                                         :
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

Chong Shing Wu, presently incarcerated at MDC Brooklyn pending his return to FCI Tucson, brings this petition for a writ of habeas corpus under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence and judgment. Wu is currently serving a sentence of 85 months' imprisonment that was imposed by the Honorable Leonard B. Sand after a jury found Wu guilty of one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349.

In his petition, Wu asserts, in substance, that he received ineffective assistance of counsel from his pretrial and trial counsel because counsel failed to make necessary pretrial motions, failed to properly evaluate and handle Wu's mental competency at trial, failed to call certain witnesses or introduce certain documents at trial, failed to request limiting instructions respecting unrelated

evidence, and failed to properly object or request modifications to certain jury instructions. (See Petition at 37-64, 13 Civ. 8358, ECF No. 3.)[1]

For the reasons set forth below, Wu's petition is DENIED.

I.    PROCEDURAL HISTORY

In August 2008, Wu was arrested and charged (along with Olivia Bowen, Noemi Dodakian, and Robert Ingram) in Count Two of a two-count Superseding Indictment with participating in a conspiracy to commit wire fraud. (Superseding Indictment at 3-4, ECF No. 38.)

Following his arrest, on or about September 3, 2008, Wu retained Seth Ginsberg, Esq., to represent him. (Ginsberg Decl. ¶ 2, ECF No. 280-2.) Though Ginsberg did not independently file any pretrial motions on Wu's behalf, several of Wu's co-defendants filed motions to suppress and motions to sever the conspiracies charged in Counts One and Two under Rules 8 and 14. (ECF Nos. 72, 89.) Judge Sand denied all of these motions in a published opinion. United States v. Bowen, 689 F. Supp. 2d 675 (S.D.N.Y. 2010). With respect to defendants' motion to sever, Judge Sand held joinder proper under Rule 8(b) because "[t]he two schemes had overlapping participants and victims, and the collaboration between the two conspiracies suggests a common scheme," and "the substantial identity of facts, as demonstrated by the common participants, the movement of victims across the schemes, and Ingram's knowledge of the existence and nature of the other scheme."

---

[1] Unless otherwise noted (as is done here), all ECF references in this Opinion & Order correspond to the docket in United States v. Chong Shing Wu, 07 Cr. 961 (KBF).

Id. at 685. Judge Sand also declined to exercise his discretion to order severance under Rule 14(a), finding no particular prejudice from proceeding against all defendants in a single trial "beyond the usual prejudice anticipated by Rule 8, which would result from proceeding on the Indictment. Furthermore, any risk of prejudice can be addressed through proper jury instructions." Id. at 685-86.

On or about April 6, 2010, Ginsberg was replaced as counsel to Wu by Michael Hurwitz, Esq., who was appointed under the Criminal Justice Act ("CJA"). (Ginsberg Decl. ¶ 3; Hurwitz Decl. ¶ 1, ECF No. 280-1.) Within the next week, two of Wu's co-defendants—Bowen and Ingram—pleaded guilty pursuant to plea agreements with the government. (ECF Nos. 107, 110.) Wu and Dodakian proceeded to trial by jury on the Superseding Indictment on October 18-21, 25-28, and November 1, 2010; at trial, Wu was represented by Hurwitz. After the government rested its case, Dodakian's counsel moved for dismissal pursuant to Rule 29 on the grounds that the government had failed to introduce sufficient evidence to establish venue; Hurwitz joined in the motion as to Count Two on Wu's behalf. (Trial Tr. at 869.) Judge Sand denied the motion. (Id. at 871.) On November 1, 2010, the jury returned a verdict of guilty against Wu on Count Two of the Superseding Indictment, the sole count with which he was charged.[2]

---

[2] The jury also returned a verdict of guilty against Dodakian for Counts One and Two of the Superseding Indictment, the counts with which she had been charged.

Following trial, on January 26, 2011, Wu replaced Hurwitz with Robert Del Col, Esq., who Wu retained.[3] (Hurwitz Decl. ¶ 1.) On May 18, 2011, Judge Sand sentenced Wu to 85 months' imprisonment, three years' supervised release, restitution of $6,893,862, and a $100 special assessment. (ECF No. 159.)

Wu, along with Ingram and Dodakian, timely appealed their convictions and sentences; on appeal, Wu raised the following arguments: (1) insufficiency of the evidence to support the verdict; (2) ineffective assistance of counsel; (3) improper calculation of Wu's offense level under the Sentencing Guidelines; and (4) an erroneous "no ultimate harm" jury instruction. United States v. Ingram, 490 F. App'x 363, 366-67 (2d Cir. 2012). The Second Circuit consolidated Wu's appeal with those of his co-defendants and, on July 27, 2012, the Second Circuit affirmed their convictions and sentences in a summary order. Id. at 367.

The Second Circuit rejected three of Wu's four arguments, declining to reach his argument that he received ineffective assistance of counsel. Id. at 366-67. With respect to the sufficiency of the evidence, the Second Circuit held that "both victim testimony and documentary evidence supported the jury's finding that Wu knowingly joined Ingram and took action in furtherance of the fraudulent scheme, including making intentional misrepresentations to potential 'investors.'" Id. at 366. The Court noted that Wu's argument as to sufficiency "amounts to a complaint that the jury did not accept his good-faith defense." Id. The Court rejected Wu's

---

[3] Del Col represented Wu leading up to sentencing, at sentencing, and on appeal; Del Col also filed the instant petition on Wu's behalf and represented him at the evidentiary hearing before this Court on April 10 and 15, 2014.

4

argument as to the calculation of his offense level at sentencing because "Wu asserts only that the court should have drawn different inferences but does not adequately explain why the inferences the court did draw were impermissible." Id. Finally, the Court rejected Wu's argument regarding the no ultimate harm jury instruction, reasoning that "the evidence did admit of the requisite distinction between immediate harm (the misrepresentations made to investors to deprive them of the short-term use of their money) and ultimate harm (the permanent deprivation of investors' money)." Id. at 367.[4]

The instant petition pursuant to 28 U.S.C. § 2255 was filed on September 18, 2013, and was therefore filed within the one-year statute of limitations imposed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). 28 U.S.C. § 2255(f)(1); Clay v. United States, 537 U.S. 522, 527 (2003) ("Finality attaches when this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires.").[5] Wu's petition was assigned to this Court at the time it was filed. The government opposed the petition on December 16, 2013, and the petition became fully briefed on January 15, 2014.

II.  FACTUAL BACKGROUND

As the Second Circuit explained in its summary order, "both victim testimony and documentary evidence [introduced at trial] supported the jury's finding that Wu

---

[4] The Second Circuit's analysis as to this issue is explained in greater detail in Section V.F infra.
[5] This is Wu's first motion for collateral relief and is thus properly before the Court without the need for certification by the Second Circuit. 28 U.S.C. § 2255(h).

5

knowingly joined Ingram and took action in furtherance of the fraudulent scheme, including making intentional misrepresentations to potential 'investors.'" Ingram, 490 F. App'x at 366.

Specifically, two victims of the scheme, Karolyn Garstin and Mohammed Toor, testified about misrepresentations that Wu made to them. At a meeting also attended by Ingram, Wu falsely told Garstin that, through his experience with the CIA, he had gotten to know many heads of state and was thereby able to participate in exclusive and sophisticated high-yield investment programs. (Trial Tr. at 69-73.). He also briefly showed her what he claimed was a highly classified document proving that the former Philippine leader Ferdinand Marcos was still alive and that Marcos' gold backed a $23 billion "certificate of time deposit." (Id. at 81-84). Wu represented to Garstin that he was an authorized "proponent-beneficiary" of the $23 billion note, even though Wu had received an e-mail terminating his purported authorization months before he told Garstin that he had such authorization. (Id. at 72-74, 841-42.) Wu made similar false claims to Toor in a conversation involving Ingram that was recorded by the FBI with Toor's consent and played at trial; on the call, Wu stated that his involvement with the note was "highly classified," and that the Federal Reserve backed it. (Id. at 483-84; GX 3121A.)

Mark Gold, a senior investigator with the Federal Reserve Bank of New York, testified, however, that Wu was not employed by the Federal Reserve and that the purported $23 billion note was not, and could not have been, backed by the Federal Reserve. (Trial Tr. at 858-63.) FBI Special Agent Kevin Irwin testified

that, at the time of Wu's arrest, Wu possessed fraudulent and forged documents in furtherance of the scheme—Wu possessed the "certificate of time deposit" document itself (which was not in fact underwritten by the Federal Reserve) as well as a shiny purported Federal Reserve note that Gold testified was fraudulent. (Id. at 841-43, 858-63.) This purported note was consistent in appearance to the document that Wu flashed in front of Garstin in an effort to persuade her that the investment was legitimate. (Id. at 81-84.)

Angela Clancy, a forensic accountant, testified that Wu received hundreds of thousands of dollars from Ingram, as well as funds directly from Garstin, and that Wu did not appear to have any salary or other source of income during the period of the fraud. (Id. at 789-94.) Clancy testified that, in total, Wu received approximately $1.7 million in funds, over $1 million of which was derived from the scheme. (Id. at 791.)

The jury also heard testimony from Special Agent Irwin regarding a Mirandized post-arrest statement by Wu, during the course of which Wu made several admissions. Wu admitted that he had engaged Ingram to raise funds for him to negotiate the purported $23 billion note; that he had received funds from Ingram in response to this request; that these funds, along with funds purportedly borrowed from family members, represented his sole source of income; that he had spent the funds on personal expenses; that he had met with Ingram and investors; and that he was not, in fact, an agent of the Federal Reserve. (Id. at 816-820.)

7

Hurwitz, who represented Wu at trial, called one witness during the defense case. The witness, Joseph Aufiero, testified that he had traveled to the Philippines with Wu, had observed Wu meet with someone named Marilou Cruz, and understood that Wu had obtained authorization from Cruz to negotiate the purported $23 billion certificate of time deposit. (Id. at 900-05.) On cross-examination, however, Aufiero testified as to many matters about which he had been deceived by Wu. Aufiero explained that he first began sending money to Wu around 2003, based on Wu's representations that he had expertise in financial matters. (Id. at 906-07.) After Wu failed to pay the returns he had promised to Aufiero, Wu issued Aufiero a post-dated check for $110,000 that bounced when Aufiero tried to negotiate it. (Id. at 907-08.) Wu also solicited money from Aufiero, claiming the money was needed to negotiate the authorization of the purported $23 billion note in the Philippines, without ever telling Aufiero when his authorization to negotiate the purported note had actually been withdrawn by Cruz (which Aufiero learned directly from Cruz). (Id. at 912, 915-16.)

## III. THE EVIDENTIARY HEARING

In an Order dated January 17, 2014, the Court stated that, in light of the fact that it had not presided over the trial,[6] "a hearing on this petition would be helpful to the Court." (ECF No. 287.) Accordingly, this Court held an evidentiary hearing on April 10 and 15, 2014, at which Ginsberg, Hurwitz, and Wu testified. Wu was

---

[6] Because the Court presided over the trial of one of Wu's co-defendants in January 2013, it was already generally familiar with the facts and circumstances of the case.

present at both hearing sessions and was represented by counsel, Del Col; Del Col has represented since January 2011, which included Wu's sentencing, appeal, and the instant petition.

Both Ginsberg and Hurwitz testified credibly and consistently with the declarations they submitted in connection with the government's opposition to the petition. Ginsberg and Hurwitz described their substantial criminal defense experience at the outset of their testimony. Ginsberg had worked primarily in federal criminal defense for more than 15 years at the time he commenced his representation of Wu, including work on ten to fifteen trials and successful motions to transfer venue. (4/10/14 Tr. at 7-9, 13 Civ. 8358, ECF No. 10.) Hurwitz had worked as a criminal defense lawyer for more than 40 years at the time he commenced his representation of Wu, including work on more than 50 criminal trials (more than 20 of which were in federal court). (Id. at 53-54.)

Both Ginsberg and Hurwitz testified that:

- Upon commencing their representations of Wu, they analyzed the discovery material from the government and discussed the strength of the case with Wu (id. at 10-14, 54-56, 63-64);

- Though Wu is a native of Taiwan, they had no difficulty communicating with Wu in English (id. at 22-23, 70);

- They viewed the government's evidence against Wu to be strong, and advised Wu that it was in his best interest to explore a plea agreement rather than to go to trial (id. at 13-14, 60-66; Hurwitz Decl. ¶¶ 2-3);

9

- They engaged in plea discussions with the government with Wu's permission, but none of the offers they received included a recommendation for a probationary sentence (4/10/14 Tr. at 14-16, 60-66; Ginsberg Decl. ¶¶ 4, 6; Hurwitz Decl. ¶ 5);

- They never told Wu that he would receive a probationary sentence if he pleaded guilty[7] (4/10/14 Tr. at 15-16, 33, 63); and

- They considered filing pretrial motions, including motions for severance and for change of venue, but determined there was no viable basis for obtaining such relief[8] (id. at 31-33, 58-59, 73-74).

According to Ginsberg, Wu stated that he did not want to admit guilt because he thought it would bring dishonor to himself and to his family, but that he also did not want to go to trial because Wu understood the potential impact on his likely sentence if convicted. (Id. at 16-17.) Ginsberg testified that Wu participated in a "reverse proffer" with the government—at which the government explained to Wu its case against him—on March 25, 2010, but that the meeting ultimately "morphed" into an actual proffer on April 5, 2010 at which Wu signed a proffer

---

[7] In his declaration, Ginsberg states that "[t]he only possibility of a resolution of the matter without the likelihood of incarceration that was discussed with the government was the option for Mr. Wu to cooperate, which Mr. Wu declined to do." (Ginsberg Decl. ¶ 7.)

[8] In particular, Ginsberg testified that, at the time he was representing Wu, Ingram's presence in the case made a motion for severance unlikely to succeed because Ingram was involved in both fraudulent schemes charged in the Superseding Indictment; Ginsberg also testified that there was enough of a connection to this District to sustain venue (and Ginsberg had brought a successful motion to transfer venue previously). (Id. at 31-33.) Similarly, Hurwitz testified that the involvement of Ingram in both charged schemes (one of which included Wu), made a motion for severance unlikely to be successful, and he also did not believe a motion to transfer venue was proper. (Id. at 58-59, 73-74.)

10

agreement. (Id. at 17-20.) Wu indicated to Ginsberg that he wanted a cooperation agreement from the government but did not want to plead guilty; Ginsberg testified that, prior to the second meeting, he explained to Wu that a cooperation agreement would require Wu to be forthcoming, to provide information about others, and to implicate himself in the charged conduct. (Id. at 20-21.) According to Ginsberg, Wu stated that this was acceptable. (Id. at 21.) At the April 5, 2010 proffer, however, Ginsberg testified that Wu told a story to the government consistent with innocence, which was directly contrary to their discussions prior to the meeting. (Id. at 23-24, 49.)

Following the proffer, Ginsberg testified he told Wu that, in light of what had occurred, he had concerns about Wu's mental competency. (Id. at 41.) Ginsberg testified that these concerns stemmed from the shifting nature of Wu's story as well as the outlandish nature of many of his explanations—for example, Wu stated to Ginsberg that there had been some form of government approval by the Federal Reserve for the $23 billion note, that former Secretary of State Colin Powell and the Israeli Mossad had been involved in discussions concerning the note, and that Wu had been given $100 bills by an individual from Israel that were able to track Wu's movements. (Id. at 25-29, 37-39.) Ginsberg told Wu that he could not in good faith bring his case to trial without bringing his concerns to the Court's attention; Ginsberg testified that, as a result, Wu indicated that he did not want Ginsberg to continue to represent him. (Id. at 27-29, 45.)

11

Though Hurwitz testified that he did not recall any discussions with Ginsberg about Wu's competency (id. at 56), the transcripts of the conferences before Judge Sand make clear that Ginsberg raised the issue with the court, the court asked Hurwitz to consider whether any applications were appropriate, Hurwitz did so, and reported back that he had no applications concerning Wu's competency.[9] Hurwitz testified at the evidentiary hearing that he had no concerns about Wu's competency during the course of his representation. (Id.) Hurwitz testified that Wu consistently maintained his innocence, and that Wu understood the charges against him and assisted in his defense. (Id. at 69-70, 77.) Hurwitz testified that he saw no basis for an incompetency or insanity defense. (Id. at 83.)

Wu testified extensively at the hearing concerning the charged conduct for which he was convicted by the jury. The overwhelming majority of this testimony was not, however, relevant to the ineffective assistance of counsel arguments raised in the instant petition.[10] The Court listened closely to Wu's testimony and observed his demeanor, and found that many of his after-the-fact assertions concerning the events at issue lacked credibility.

Wu testified that Ginsberg promised him he could plead guilty and answer questions truthfully at the April 5, 2010 proffer in exchange for a probationary

---

[9] A more detailed discussion of this sequence of events is included in Section V.C infra.

[10] The Second Circuit rejected Wu's sufficiency of the evidence argument on direct appeal, Ingram, 490 F. App'x at 366, and Wu chose not to testify at trial. (Hurwitz Decl. ¶ 10.) Though Wu testified at one point during the hearing (nearly three and a half years later) that Hurwitz told him not to take the witness stand at trial (see 4/15/14 Tr. at 14, 13 Civ. 8358, ECF No. 12), there is no allegation in the petition that Wu was not fully informed of his right to testify and chose not to do so knowingly and voluntarily.

sentence, and that "everybody" at the proffer heard this guarantee. (4/15/14 Tr. at 4, 13 Civ. 8358, ECF No. 12; Wu Aff. ¶ 6, ECF No. 286.) Wu testified that he was willing to plead guilty (though he was not in fact guilty) because he needed time to bury his son (who passed away in January 2010). (4/15/14 Tr. at 4-5.) Wu testified that Ginsberg did not tell him prior to their appearance in court on April 6, 2010 that Ginsberg was going to resign as his counsel, and that Judge Sand assigned a CJA attorney (Hurwitz)[11] because he did not want to further delay the trial date. (Id. at 5-6.) Wu then testified that Hurwitz told him to plead guilty within 30 minutes of being assigned as his lawyer. (Id. at 9-10.)

Wu testified that he asked Hurwitz to subpoena Colin Powell as well as others (including Ingram) to testify at trial concerning the $23 billion certificate of time deposit. (4/10/14 Tr. at 115-17, 120, 122-23; 4/15/14 Tr. at 10-11.) Wu testified that Hurwitz told him that certain documents Wu provided him (regarding Wu's finances) were irrelevant and, thus, were not introduced at trial. (4/10/14 Tr. at 125-29; 4/15/14 Tr. at 8, 16-17.) Wu also testified that the witness called by the defense, Aufiero, changed his story on the stand from a prior statement he made to the FBI related to who introduced whom to Cruz, but that Hurwitz failed to raise this issue when he questioned Aufiero. (4/15/14 Tr. at 11-13.)

---

[11] Hurwitz was on the CJA panel in this District at the time. (4/10/14 Tr. at 54.)

On cross examination, Wu made several critical admissions that further undermined both his credibility and claims of innocence, including:

- Wu admitted he met with individuals who ultimately invested in the $23 billion certificate of time deposit with Ingram, and was present for Ingram's representations to investors about the investment (id. at 29-32, 34);

- Wu admitted that he never disclosed to the investors with whom he communicated that Cruz had withdrawn authorization for the note (Wu testified that the email he received stating this fact was not to be believed) (id. at 34-35);

- Wu admitted that he represented to investors that he had expertise in business and investments, though he had not made any money in these or similar investments for more than 20 years (id. at 35-36);

- Wu admitted to receiving several hundred thousand dollars in wire transfers and checks from Ingram and Aufiero, and claimed that these payments were "reimbursements" related to his expenditures on the alleged business (though he also spent some of this money on a girlfriend in Switzerland) (id. at 37-39);

- Wu testified that he thought Ingram was "borrowing" this money from his friends (id. at 43); and

- Wu admitted that his statements in his affidavit that Hurwitz told him "[d]on't worry, they don't have a case," and "[r]elax, we don't have to do

14

anything" with respect to his trial strategy (Wu Aff. ¶ 12) were incorrect; Wu admitted that in fact Hurwitz told him that the government had a strong case and that Wu should plead guilty (4/15/14 Tr. at 41-43).

IV.   LEGAL STANDARDS

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that (1) his or her counsel's performance "fell below an objective standard of reasonableness" measured under "prevailing professional norms," and (2) he or she was prejudiced by counsel's deficient performance such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).

As to the first prong of Strickland, attorney conduct is subject to an objective standard of reasonableness, and is accorded deference in light of the "range of legitimate decisions" that accompanies the various circumstances encountered by counsel. Id. at 688-89. As a result, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that [t]here are countless ways to provide effective assistance in any given case and that [e]ven the best criminal defense attorneys would not defend a particular client in the same way." United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (internal quotation marks omitted) (citing Strickland, 466 U.S. at 689).

15

"[D]ecisions that fall squarely within the ambit of trial strategy, . . . if reasonably made, cannot support an ineffective assistance claim." United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992) (internal quotation marks and citation omitted). "The decision not to call a particular witness is typically a question of trial strategy that . . . courts are ill-suited to second-guess." United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) (citations omitted). Accordingly, "counsel's decision as to whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation." Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005) (internal quotation marks omitted) (quoting United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000)); United States v. Eyman, 313 F.3d 741, 743 (2d Cir. 2002) ("A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel.").

As to the second prong of Strickland, a petitioner must show that, but for his or her attorney's deficient performance, there is a reasonable probability that the result would have been different. Strickland, 466 U.S. at 694. More is required than a mere showing "that the errors had some conceivable effect on the outcome of the proceeding," as "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." Id. at 693.

The Second Circuit has rejected § 2255 petitions based on ineffective assistance of counsel because a petitioner is unable to show prejudice in light of "overwhelming evidence of guilt adduced at trial." Strouse v. Leonardo, 928 F.2d

16

548, 556 (2d Cir. 1991); see United States v. Simmons, 923 F.2d 934, 956 (2d Cir.

1991) ("[G]iven the plethora of evidence against him, there is little reason to believe

that alternative counsel would have fared any better."); United States v. Reiter, 897

F.2d 639, 645 (2d Cir. 1990) (similar).  The required showing is even more difficult

in cases where a petitioner makes statements in open court describing his or her

conduct, or expressing an understanding of his or her rights; courts afford "a strong

presumption of verity" to such statements.  See Blackledge v. Allison, 431 U.S. 63,

73-74 (1977).

V.    DISCUSSION

Though Wu asserted more than twenty bases for relief in his original

petition, at the conclusion of the evidentiary hearing, Wu's counsel confirmed that,

in light of the testimony, he is pursuing only the following five arguments as to

ineffective assistance of counsel: (1) the failure to advance arguments related to

venue, severance, and suppression of evidence; (2) the failure to file formal notice of

an insanity defense, despite describing Wu to the jury using similar terms; (3) the

failure to properly object to "spillover" evidence introduced at trial; (4) the failure to

introduce exculpatory evidence concerning Wu at trial; and (5) the failure to request

a modified "good faith" jury instruction, or to otherwise preserve his objection to the

no ultimate harm instruction that was given.  (See Reply at 2-3, ECF No. 283;

4/15/14 Tr. at 57-60.)

With the exception of Wu's first argument, each of these arguments is

premised on the conduct of Hurwitz, Wu's trial counsel.  For the reasons set forth

17

below, these arguments are without merit, and do not entitle Wu to any relief under 28 U.S.C. § 2255.

A.     Lack of Prejudice

Even assuming Wu's counsels' performance was deficient in some way (which, as discussed infra, it was not), Wu cannot meet the required showing of prejudice: that there is a reasonable probability the result at trial[12] would have been different. See Strickland, 466 U.S. at 694. As both Ginsberg and Hurwitz explained to Wu in advance of trial and at the hearing on this petition, the government's evidence of Wu's guilt was substantial. Wu personally made representations to potential investors (including Garstin and Toor, who testified at trial) about the scheme, these people invested in the scheme, and Wu received hundreds of thousands of dollars in investor funds from Ingram. These facts are confirmed by the financial records introduced at trial and Wu's post-arrest statements to the FBI.

In sum, Wu's conviction merely confirmed the otherwise substantial evidence of guilt introduced by the government at trial. See Strouse, 928 F.2d at 556; Simmons, 923 F.2d at 956; Reiter, 897 F.2d at 645. Wu's testimony at the evidentiary hearing, during which he described the funds he received from Ingram as "reimbursements" for business expenses that he thought Ingram had "borrowed" from his friends, only adds to the weight of the evidence of Wu's guilt. Wu's claims

---

[12] Wu is no longer asserting that he received ineffective assistance of counsel as a result of the plea bargaining process prior to trial. (4/15/14 Tr. at 57-58.)

for relief under 28 U.S.C. § 2255 on the basis of ineffective assistance of counsel thus fail because they provide insufficient evidence of prejudice under Strickland.

### B.    Venue, Severance, and Suppression

Wu argues that Ginsberg's and Hurwitz's performance was deficient because they failed to advance relevant arguments concerning venue, the need for separate trials, and the "suppression of tangible evidence." (See Reply at 3; Petition at 57-58, 60-63.) Wu also echoed this argument at the evidentiary hearing, when he testified that he discussed (generally) pretrial motions with Hurwitz, but that Hurwitz failed to make certain motions. (4/10/14 Tr. at 129-30.)

These arguments are without merit. Both Ginsberg and Hurwitz testified that, upon commencing their respective representations of Wu, they considered whether any pretrial motions (including motions to sever and for lack of venue) were appropriate, and found them to be without any legal basis.[13] Though Wu argues that Ingram's guilty plea (which was entered after Hurwitz replaced Ginsberg as Wu's counsel) changed the landscape in some way, Hurwitz testified that he still viewed a motion to sever as unlikely to succeed because Wu was charged as part of the same conspiracy as Dodakian in Count Two of the Superseding Indictment. (Hurwitz Decl. ¶ 6.) Additionally, Judge Sand denied Dodakian's pretrial motion for severance as well as her Rule 29 motion to dismiss for lack of venue (in which Hurwitz joined). To the extent Wu argues that Hurwitz

---

[13] In fact, at the April 10, 2014 hearing, Wu's counsel stated during the cross examination of Ginsberg that he was "more than conceding [Ginsberg's] skill and experience. I tip my hat to you." (4/10/14 Tr. at 42-43.)

19

should have moved to suppress a taped phone call involving Wu, Ingram, and Toor (see Petition at 63), Wu provides no legal or factual basis for such a motion.  To the contrary, Hurwitz testified at the hearing that he listened to the call prior to trial and did not believe there was <u>any</u> basis for challenging the introduction of the call into evidence.  (4/10/14 Tr. at 91-92.)

C.    <u>Wu's Competency</u>

Wu argues that Hurwitz's performance at trial was deficient because he failed to invoke the procedures of Rule 12.2 concerning notice of an insanity defense and mental examination, despite his decision to refer to Wu as "delusional," "a little strange," "a little nuts," and "a little off" at trial.  (<u>See</u> Petition at 54-55; Trial Tr. at 56, 152-53, 1198, 1200.)  The Court rejects this argument.

Rule 12.2 provides that "[a] defendant who intends to assert a defense of insanity at the time of the alleged offense must so notify an attorney for the government in writing within the time provided for filing a pretrial motion, or at any later time the court sets, and file a copy of the notice with the clerk."  Fed. R. Crim. P. 12.2(a).  The rule permits a mental examination either by court order or upon a motion by the parties.  <u>Id.</u> 12.2(c)(1).  Courts must grant a motion for a mental competency hearing "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a).  In making this determination, courts will look to factors such

20

as the defendant's conduct and demeanor, representations made by the defendant's attorneys, and prior medical opinions and diagnoses. See Drope v. Missouri, 429 U.S. 162, 180 (1975).

The record makes clear, however, that Hurwitz specifically evaluated this issue at the time he took over the representation of Wu (after Ginsberg had raised his concerns with the Court) and determined that there was no reason to seek an evaluation of Wu's competency at that time.

At a conference before Judge Sand on April 6, 2010, Ginsberg stated Wu's desire to obtain new counsel and for the Court to appoint counsel to represent him. (4/6/10 Tr. at 2, ECF No. 112.) In response, Judge Sand asked Wu whether it was his wish to replace Ginsberg; Wu stated that it was because "he "cannot pay him any more" and that "the understanding from the attorney with me is not acceptable." (Id. at 2-3.) Ginsberg stated in open court that communications between he and Wu had deteriorated to a point where he would no longer be able to effectively represent him. (Id. at 3.) Subsequently, in a session in the robing room, Ginsberg raised his concerns about Wu's competency and the need for incoming counsel to consider an evaluation of Wu's competency to stand trial. (Id. at 13-14; 4/10/14 Tr. at 42.)

Judge Sand specifically asked Ginsberg to communicate his concerns to Wu's new counsel, Hurwitz, who was appointed the same day. (4/6/10 Tr. at 4, 14.) Though Hurwitz testified at the evidentiary hearing that he did not recall any discussions with Ginsberg about Wu's competency (see 4/10/14 Tr. at 56), the

21

transcript of the subsequent status conference on April 15, 2010 indicates that Hurwitz considered the issue of Wu's competency upon commencing his representation and "saw nothing" to support any applications at that time.  (See 4/15/10 Tr. at 4, ECF No. 115.)

Hurwitz testified at the evidentiary hearing that Wu understood the charges against him and actively participated in his defense throughout trial, which Wu confirmed through his descriptions of his interactions with Hurwitz at trial.  As the Court noted on the second day of the hearing on this petition, "based upon the Court's view of the witness on the stand, if he was as he is now back then, [it] wouldn't perceive a reason to, as a court, request an evaluation of his mental capacity."  (4/15/14 Tr. at 56.)  The assertion that Hurwitz should have requested a competency hearing or otherwise invoked Rule 12.2 in light of the outlandish nature of the explanations Wu provided for his conduct is insufficient; as the Second Circuit has recognized, in some fraud cases a defendant's seemingly bizarre behavior may properly be considered as "entirely consistent" with his fraudulent scheme rather than requiring a competency hearing.  See Zovluck v. United States, 448 F.2d 339, 341-43 (2d Cir. 1971).

Instead, the record on this petition makes clear that Hurwitz decided to use certain terms to describe Wu not because he actually believed Wu to be delusional but in order to provide context and believability to Wu's good faith defense.  (4/10/14 Tr. at 68-69, 84-85.)  In his declaration, Hurwitz explains that, in light of Wu's inculpatory post-arrest statements to the FBI—that Wu made representations to

22

investors and received investor funds from Ingram—Hurwitz made the tactical decision to describe Wu as delusional in order to provide a non-fraudulent explanation for his conduct. (Hurwitz Decl. ¶ 4.) Hurwitz's decision to portray Wu as eccentric was thus a conscious trial strategy mounted by experienced trial counsel, and is thus entitled to deference. See Eisen, 974 F.2d at 265.

      D.    "Spillover" Evidence

      Wu next argues that Hurwitz's performance at trial was deficient because he failed to protect against "spillover" evidence related solely to Dodakian or Wu's other co-defendants, who were charged with and had pleaded guilty to other conspiracies with which Wu had not been charged. (See Petition at 48-53, 55-56.) This argument is also without merit.

      The record reflects a request for just such a limiting instruction by Hurwitz on the second day of trial; Judge Sand granted the request and then provided a lengthy limiting instruction explaining the issue at the beginning of the following trial day. (Trial Tr. at 244-46, 256-57.) Hurwitz explained at the hearing and in his declaration that he did not ask for additional limiting instructions or make additional objections throughout the trial because the point—the need to consider the evidence and the defendants separately—had been made, much of the evidence clearly did not relate to Wu on its face, and the Court would emphasize this issue again in its jury charge. (4/10/14 Tr. at 93-99; Hurwitz Decl. ¶ 9.) Hurwitz's reasoned decision as to how to handle the evidence introduced at trial that was

unrelated to Wu certainly falls within the range of legitimate decisions anticipated by Strickland and is also entitled to deference.

    E.    Exculpatory Evidence

Wu further argues that Hurwitz's performance at trial was deficient because, in substance, Hurwitz failed to introduce certain documents Wu provided to him, failed to subpoena certain witnesses Wu requested he call at trial, and failed to highlight an inconsistency in Aufiero's testimony during his examination. (See Petition at 58-64.) These arguments also do not provide a basis for relief.

As an initial matter, the Court notes that it is not clear whether any of these materials are actually exculpatory—for instance, the purported "power of attorney" document from Aufiero that was discussed during Wu's testimony at the evidentiary hearing is equally consistent with guilt and innocence. (4/15/14 Tr. at 26-27.) Though Hurwitz testified that did not recall receiving or reviewing any of the documents Wu alleges he gave to him (in particular, those related to Wu's finances) (4/10/14 Tr. at 100), he explained that these documents would not have been particularly relevant in light of the government's evidence concerning Wu's finances. (4/15/14 Tr. at 37-39; Hurwitz Decl. ¶ 8.) That Wu may have also received money from lottery winnings or other sources would not have contradicted the evidence in bank records and from a forensic accountant that Wu had received several hundred thousand dollars from Ingram (a fact which Wu himself confirmed in a post-arrest statement).

In any event, these arguments concerning the failure to introduce certain evidence, to call certain witnesses, or to ask certain questions do not constitute deficient performance; they constitute the kind of second-guessing of trial strategy that is not permitted under Strickland. See Greiner v. Wells, 417 F.3d at 323; Luciano, 158 F.3d at 660. That Wu's current counsel, with the benefit of hindsight, believes he would have made different choices had he represented Wu at trial is of no moment. In both his declaration and at the evidentiary hearing, Hurwitz explained the nature of the good faith defense he asserted on behalf of Wu, the strength of the government's case, and his decision to call Aufiero (a potentially hostile witness) in the defense case in order to support Wu's beliefs about the propriety of his actions. (Hurwitz Decl. ¶ 7.) Hurwitz's evaluation of these risks and rewards may not serve as the basis for an argument that these decisions resulted in ineffective assistance of counsel. See Eyman, 313 F.3d at 743.

F.  Jury Charge

Finally, Wu argues that Hurwitz's performance at trial was deficient because he failed to request a modified good faith charge, or to otherwise properly preserve an objection to the version of the charge that Judge Sand delivered to the jury. (See Petition at 37-42.) The piece of the instruction at issue, which is often described as a no ultimate harm instruction, is as follows:

> There is another consideration to bear in mind in deciding whether or not the defendant you are considering acted in good faith. If that defendant agreed to participate in the scheme to defraud, then a belief by that defendant, if such belief existed, that ultimately everything would work out so that no one would lose any money does not require a

> finding by you that the defendant acted in good faith. If the defendant
> you are considering participated in the scheme for the purpose of
> causing some financial or property loss to another, no amount of that
> defendant's honest belief that the scheme would eventually cause no
> loss or make a profit for the investors will excuse fraudulent acts or
> false representations by that defendant.

(Trial Tr. at 1278-80.)

Wu's current counsel concedes that this instruction describes the defense

asserted by Dodakian, who took the stand at trial, but argues it was error as to Wu

under United States v. Rossomando, 144 F.3d 197 (2d Cir. 1998), because there was

an insufficient factual predicate for the charge. (See Petition at 37-40.) Wu argues

Hurwitz then rendered ineffective assistance by failing to propose alternative

language with respect to Wu or to otherwise object so as to preserve the issue for

appeal, with result being that the Second Circuit applied plain error analysis to the

instruction rather than de novo review of the issue. (See id. at 42-45.)

Though the Second Circuit did not reach the question of whether Judge Sand

erred in giving the instruction as to Wu, it reasoned:

> Only in Rossomando have we ever concluded that a "no ultimate harm"
> instruction was given in error, and our reasoning in Rossomando does
> not apply to Wu's case. The instruction is predicated on a distinction
> between immediate and ultimate harm that was simply nonexistent
> under the unique facts of Rossomando, and it was for that reason that
> we concluded that giving the instruction constituted prejudicial error
> in Rossomando. Here, in contrast, the evidence did admit of the
> requisite distinction between immediate harm (the misrepresentations
> made to investors to deprive them of the short-term use of their
> money) and ultimate harm (the permanent deprivation of investors'
> money). As such, the instruction was not plainly erroneous.

Ingram, 490 F. App'x at 367 (citations omitted).

Wu's argument that he is entitled to relief for Hurwitz's failure to object to this instruction or to request supplemental language is without merit; these decisions by Hurwitz do not constitute deficient performance under Strickland. In his declaration,[14] Hurwitz states that he did not contest this instruction because (1) it is part of a standard charge that Judge Sand himself authored, and (2) it plainly applied to the factual circumstances of this case. (Hurwitz Decl. ¶ 6.) Hurwitz also stated that he was aware Dodakian's counsel had moved to strike the instruction at issue, and that his motion was denied. (Id.; Trial Tr. at 872-74.) While Judge Sand's no ultimate harm instruction may have more closely tracked the specific defense asserted by Dodakian at trial, it was not unreasonable for Hurwitz to believe that the appropriate factual predicate also existed as to Wu and that his objection would have otherwise been unavailing.[15]

---

[14] Hurwitz testified at the hearing that he did not specifically recall the jury charge or the charging conference. (4/10/14 Tr. at 87-89.)

[15] As the Second Circuit noted, the evidence as to Wu "did admit of the requisite distinction between immediate harm (the misrepresentations made to investors to deprive them of the short-term use of their money) and ultimate harm (the permanent deprivation of investors' money)" that was not present in Rossomando. Ingram, 490 F. App'x at 367. Wu admitted as much in his post-arrest statement, and these facts were corroborated through the testimony of Garstin and Toor and the taped call involving Wu, Ingram, and Toor. Even Aufiero, Wu's own witness, testified that Wu solicited money from him (in the short-term) in order to continue to negotiate the authorization of the $23 billion note in the Philippines so as to secure a payout down the road, despite the fact that Wu had already been told by Cruz that this authorization had been withdrawn. (See Trial Tr. at 912-16.)

## VI.    CONCLUSION

For the reasons set forth above, Wu's petition to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 is DENIED.

The Court declines to issue a certificate of appealability because there has been no "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); see Matthews v. United States, 682 F.3d 180, 185 (2d Cir. 2012).

The Court also finds, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from the denial of this motion would not be taken in good faith.  See Feliz v. United States, No. 01 Civ. 5544 (JFK), 2002 WL 1964347, at *7 (S.D.N.Y. 2002).

The Clerk of the Court is directed to close the motion at ECF No. 279 in 07 Cr. 961, and to close the action 13 Civ. 8358.

SO ORDERED.

Dated:     New York, New York
           May 20, 2014

_____
KATHERINE B. FORREST
United States District Judge

28